2014 OK 49

STATE of Oklahoma, ex rel. E. Scott PRUITT, Attorney General of Oklahoma, Plaintiff/Appellee,

v.

NATIVE WHOLESALE SUPPLY, a Corporation chartered by the Sac and Fox Tribe of Oklahoma, Defendant/Appellant.

No. 111985.

Supreme Court of Oklahoma.

June 10, 2014.

Rehearing Denied Oct. 27, 2014.

E. Clyde Kirk and Ryan R. Chaffin, Assistant Attorneys General, Oklahoma City, OK, for appellee, State of Oklahoma ex rel. E. Scott Pruitt, Oklahoma Attorney General.

David L. Kearney, Gregory T. Metcalfe, and Paula M. Williams, Oklahoma City, OK, for appellant, Native Wholesale Supply.

TAYLOR, J.

¶ 1 The dispositive issue in this appeal is whether the appellee, the State of Oklahoma represented by the Attorney General of Oklahoma (AG), was entitled to summary judgment in the amount of $47,767,795.20, as a matter of law. In deciding the propriety of summary judgment, we must address two underlying questions: 1) whether the district court, on remand, was bound by the facts supporting our holdings in the earlier appeal, *State ex rel. Edmondson v. Native Wholesale Supply*, 2010 OK 58, 237 P.3d 199 (cert. denied, *Native Wholesale Supply v. State of Okla.*, —— U.S. ——, 131 S.Ct. 2150, 179 L.Ed.2d 935 (2011))(*Native Wholesale Supply I*); and 2) whether the district court

should have proceeded to a jury trial requested by the appellant, Native Wholesale Supply (NWS). We answer the first underlying question in the affirmative and the second in the negative. We conclude and hold that the AG was entitled to summary judgment in the amount of $47,767,795.20, as a matter of law.

## I. The Tobacco Settlement and Related Legislation

¶ 2 In 1998, four of the largest tobacco product manufacturers and forty-six states entered into a Master Settlement Agreement (MSA) to settle litigation brought by the states to recoup health care expenses resulting from cigarette smoking.[1] In 1999, the Legislature required tobacco product manufacturers who do not join the MSA and whose cigarettes are sold in Oklahoma to make annual payments into escrow accounts to cover health care expenses resulting from cigarette smoking.[2] 1999 Okla. Sess. Laws, ch. 357(codified at 37 O.S.Supp.1999, §§ 600.21–600.23)(Escrow Statute). In 2004,

---

1. The states sued the major tobacco companies to recover their Medicaid costs due to tobacco-related disease. The MSA addressed the monetary damages, annual escrow payments, and public health issues regarding tobacco use, such as prevention of use of tobacco products by youth, advertising, smoking cessation, and education. Subsequently, some forty other tobacco product manufacturers have joined the MSA. The annual payments and a portion of the proceeds from the settlement are held in the Tobacco Settlement Endowment Trust Fund. Okla. Const., art. X, § 40.

2. In the Escrow Statute, 37 O.S.Supp.1999, § 600.21, the Legislature made the following findings:

B. The Oklahoma Legislature further finds that cigarette smoking also presents serious financial concerns for the State of Oklahoma; that, under certain health care programs, the state may have a legal obligation to provide medical assistance to eligible persons for health conditions associated with cigarette smoking; that those persons may have a legal entitlement to receive such medical assistance; and that, under these programs, the State of Oklahoma pays millions of dollars each year to provide medical assistance for those persons for health conditions associated with cigarette smoking.

C. The Oklahoma Legislature additionally finds that it is the policy of the State of Oklahoma that financial burdens imposed on the state by cigarette smoking should be borne by tobacco prod-

uct manufacturers rather than by the State of Oklahoma to the extent that such manufacturers either determine to enter into a settlement with the state, or are found culpable by the court; and that on November 23, 1998, leading United States tobacco product manufacturers entered into a settlement agreement, entitled the "Master Settlement Agreement," with the state, which obligates these manufacturers, in return for a release of past, present, and certain future claims against them as described therein, to pay substantial sums to the state (tied in part to their volume of sales); to fund a national foundation devoted to the interests of public health; and to make substantial changes in their advertising and marketing practices and corporate culture, with the intention of reducing underage smoking.

C. The Oklahoma Legislature therefore finally finds that it would be contrary to the policy of the State of Oklahoma if tobacco product manufacturers who determine not to enter into such a settlement could use a resulting cost advantage to derive large, short-term profits in the years before liability may arise without ensuring that the state will have an eventual source of recovery from them if they are proven to have acted culpably; and that it is thus in the interest of the State of Oklahoma to require that such manufacturers establish a reserve fund to guarantee a source of compensation and to prevent such manufacturers from deriving large, short-term profits and then becoming judgment-proof before liability may arise.

the Legislature enacted the Master Settlement Agreement Complementary Act (Complementary Act) to maintain the integrity of the Master Settlement Agreement.[3] 2004 Okla. Sess. Laws, ch. 266 (codified at 68 O.S.Supp.2004, §§ 360.1, et seq.).

¶3 The Complementary Act requires all tobacco product manufacturers whose cigarettes are sold in Oklahoma to list the cigarette brand names with the AG and to certify that the required annual payment into an escrow account has been made. 68 O.S.Supp.2004, § 360.4(A). Each year the AG must publish on its website the list of cigarette brand names that may be sold in Oklahoma and the list of tobacco product manufacturers who have complied with the Escrow Statute. *Id.* at § 360.4(B). The AG's website directory, the Directory of Certified Tobacco Manufacturers/Brands Approved for Sale, is accessible to the public. *Id.* The Complementary Act declares that cigarettes not listed on the AG's directory are contraband and that it is unlawful for a person to sell or possess for sale cigarettes that are not listed on the AG's directory or where the AG's directory does not show the cigarette manufacturer has complied with the Escrow Statute. *Id.* at § 360.7. The MSA, Escrow Statute, and Complementary Act guarantee a source of compensation for the costs of health conditions associated with cigarette smoking and place the financial burden for the medical assistance on the tobacco product manufacturers based on the manufacturer's relative market share rather than on the State.

## II. The Proceedings

¶4 In August of 2006, the AG removed both Seneca brand cigarettes and their manufacturer, Grand River Enterprises Six Nations, Ltd., from the AG's directory. In 2007 and 2008, NWS caused Seneca cigarettes to be brought into Oklahoma knowing that the

tobacco product manufacturer did not comply with the Escrow Statute or the Complementary Act and that the Seneca cigarette manufacturer and Seneca cigarettes were not on the AG's directory.

¶5 In May of 2008, Drew Edmondson, Oklahoma Attorney General, initiated this proceeding in Oklahoma County District Court seeking disgorgement and payment to the State of all gross proceeds realized by NWS from the sale of contraband Seneca cigarettes in violation of the Complementary Act. The petition set forth the following allegations. 1) NWS "knowingly sold, transported or caused to be transported, or imported or caused to be imported, Seneca cigarettes for sale in Oklahoma, thereby transacting business within this state and availing itself of the privilege of conducting activities within this state." 2) The Complementary Act "requires that a tobacco product manufacturer and its brand families must be listed on the Directory of Compliant Tobacco Manufacturers maintained by the Oklahoma Attorney General before the cigarettes can be lawfully sold in the state." 3) The Complementary Act makes it unlawful for a person to sell, distribute, acquire, possess, hold, own, transport, import or cause to be imported, cigarettes that the person knows or should know are intended for distribution or sale in this state in violation of the Complementary Act. 4) " 'Seneca' cigarettes are a brand of cigarettes manufactured by Grand River Enterprises Six Nations, Ltd." and neither Grand River Enterprises nor Seneca cigarettes have been listed on the AG's directory since 2006. 5) Beginning in 2007, NWS has knowingly and unlawfully sold, distributed, acquired, held, owned, possessed, transported, imported or caused to be imported Seneca brand cigarettes in this state when it knew or should have known those cigarettes were intended for distribution in violation of the Complementary Act.

**3.** 68 O.S.Supp.2004, § 360.2 provides:
The Oklahoma Legislature declares that violations of Sections 600.1 through 600.23 of Title 37 of the Oklahoma Statutes threaten the integrity of the Master Settlement Agreement as defined in Section 600.22 of Title 37 of the Oklahoma Statutes, the fiscal soundness of the state, and the public health. The Legislature declares that en-

acting this act enhances the Prevention of Youth Access to Tobacco Act by preventing violations and aiding in the enforcement of the Master Settlement Agreement Complementary Act and thereby safeguard the Master Settlement Agreement, the fiscal soundness of the state, and the public health.

¶ 6 In August of 2008, NWS removed the case to federal court asserting complete federal preemption of this state-law suit because NWS "is chartered by the Sac and Fox Nation, is wholly owned by a member of the Seneca Nation, and conducts business on Indian land with Native Americans." The federal court concluded the case was improperly removed and remanded it to the state court.

¶ 7 In June of 2009, the state district court granted NWS' motion to dismiss for lack of subject matter jurisdiction and denied NWS' motion to dismiss for lack of personal jurisdiction. The AG appealed the subject matter jurisdiction dismissal and NWS counter-appealed the personal jurisdiction ruling. This Court held "that the State has personal jurisdiction over defendant based on the Company's purposeful availment of the Oklahoma cigarette marketplace and has jurisdiction over the subject matter of this suit, the Native–American identity of the participants in the distribution channel notwithstanding." *Native Wholesale Supply I*, 2010 OK 58 at ¶ 49, 237 P.3d at 217. *Native Wholesale Supply I* remanded this case to the district court after mandate issued in August of 2010.

¶ 8 On NWS' motion filed October 25, 2010, this Court suspended the effectiveness of the mandate to allow NWS to petition for certiorari review in the United States Supreme Court. On April 25, 2011, the United States Supreme Court denied NWS' petition for a writ of certiorari to review our opinion in *Native Wholesale Supply I. Native Wholesale Supply v. State of Oklahoma,* —— U.S. ——, 131 S.Ct. 2150, 179 L.Ed.2d 935 (2011). Thereafter, NWS answered the AG's amended petition but did not respond to the AG's pending discovery requests and motions. In November of 2011, the trial court granted the AG's motion to compel, NWS filed for Chapter 11 bankruptcy in the Western District of New York, and the state court proceeding was stayed by operation of 11 U.S.C. § 362(a)(1).

¶ 9 NWS listed three states in the bankruptcy proceeding—California, New Mexico, and Oklahoma. The three states, each with a pending suit against NWS for violations of their respective complementary legislation, jointly moved to lift the automatic stay. On April 26, 2012, the bankruptcy court lifted the stay and directed that "information produced by [NWS] during discovery in the bankruptcy case shall be treated by the States as satisfying any request for such information in the State Litigation." The information NWS turned over to Oklahoma included documents showing the cigarette sales and shipping transactions between NWS and Muscogee Creek Nation Tobacco Wholesale and Bowen Wholesale from 2006 to 2010.

¶ 10 The state district court case proceeded; and, on August 17, 2012, the AG moved for summary judgment. By order dated May 9, 2013, the district court sustained the AG's motion for summary judgment, denied NWS' cross-motion for summary judgment, and entered judgment "in favor of the plaintiff, State of Oklahoma *ex rel.* E. Scott Pruitt, Attorney General of Oklahoma, in the amount of Forty–Seven Million Seven Hundred Sixty–Seven Thousand Seven Hundred Ninety–Five Dollars and 20/100 ($47,767,-795.20) against the Defendant Native Wholesale Supply." By order dated June 17, 2013, the district court denied NWS' motion for new trial. NWS appealed the summary judgment and denial of a new trial. We retained this second appeal in this protracted litigation.[4]

### III. Standard of Review

■■■■ ¶ 11 Summary judgment is a pretrial procedure available where there is no dispute as to the material facts and the inferences that may be drawn from the undisputed material facts and where the evidentiary materials establish each and every material fact necessary to support the judgment as a matter of law. *Lowery v. Echostar Satellite Corp.,* 2007 OK 38, ¶ 11, 160 P.3d 959, 963.

---

4. This Court granted NWS' motion to file additional briefs in this summary disposition appeal over the AG's objection. Rule 1.36(g), Okla. Sup. Ct. R., 12 O.S.2011, ch. 15, app. 1. NWS also filed a motion for oral argument to which the AG objected. Because oral argument is not essential to an understanding of the legal questions presented herein, NWS' motion for oral argument is denied.

We review a summary judgment *de novo*, without deference to the lower court. *Id.* We review the denial of a new trial for abuse of discretion. *Evers v. FSF Overlake Assocs.*, 2003 OK 53, ¶ 6, 77 P.3d 581, 584. It is an abuse of discretion to deny a new trial where the summary judgment was incorrect. *Id.*

**IV. In the post-remand summary proceeding, the district court was bound by the factual conclusions in *Native Wholesale Supply I*, under the circumstances in this case.**

▉ ¶ 12 In resolving the personal jurisdiction issue, *Native Wholesale Supply I* had to determine whether NWS' contacts with this State were sufficient to satisfy the Fourteenth Amendment Due Process Clause. *Native Wholesale Supply I* examined NWS' conduct under a "stream-of-commerce theory" pronounced in *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 293, 100 S.Ct. 559, 565, 62 L.Ed.2d 490 (1980), and tested that conduct by a more stringent "stream-of-commerce theory plus" in *Asahi Metal Industry Co., Ltd. v. Superior Court of California*, 480 U.S. 102, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987). Quoting from the opinion adopted by four of the Justices in *Asahi Metal*, *Native Wholesale Supply I* explained the "stream-of-commerce theory plus" as follows:

"[A] defendant's awareness that the stream of commerce may or will sweep the product into the forum State does not convert the mere act of placing the product into the stream into an act purposefully directed toward the forum State." A plaintiff must show additional conduct by the defendant directed toward the forum to support the exercise of jurisdiction consistent with the Due Process Clause.

2010 OK 58 at ¶ 14, 237 P.3d at 206 (footnotes omitted).

¶ 13 *Native Wholesale Supply I* reviewed NWS' contacts with Oklahoma in accordance with the suggestion in *Asahi Metal* that there might be sufficient contacts with the forum state where the defendant "employed the distribution system that brought the product into the forum state." *Id.* at ¶ 18, 237 P.3d at 207. *Native Wholesale Supply I* relied upon the undisputed testimony of NWS' president for the facts that NWS imported Seneca cigarettes from the manufacturer in Canada and sold the imported cigarettes to tribal entities in the United States, that sales transactions that would ultimately bring cigarettes into Oklahoma began when Muscogee Creek Nation Wholesale placed orders with NWS, and that Muscogee Creek Nation Wholesale resold the cigarettes to tribal retailers in Oklahoma. It also relied upon the undisputed fact that Seneca cigarettes are sold by retailers located on and off tribal land in Oklahoma, the undisputed fact that NWS sells a high volume of cigarettes to Muscogee Creek Nation Wholesale as part of an ongoing business relationship, and the undisputed statistic that the demand for cigarettes by members of the Muscogee Creek Nation is a small fraction of the Seneca cigarettes NWS sells to Muscogee Creek Nation Wholesale. Based upon these facts, *Native Wholesale Supply I* concluded:

[W]e are looking here at a distributor of a finished product—cigarettes—whocauses the product to be delivered to an entity in this state in such quantities that its ultimate destination can only be the general public in this state. While the entity with which Native Wholesale Supply directly deals may operate on tribal land, that tribal land is not located in some parallel universe. It is geographically within the State of Oklahoma. Both entities are engaged in an enterprise whose purpose is to serve the Oklahoma market for cigarettes.

This is not a case where the defendant is merely aware that its product might be swept into this State and sold to Oklahoma consumers. The sheer volume of cigarettes sold by Native Wholesale Supply to wholesalers in this State shows the Company to be part of a distribution channel for Seneca cigarettes that intentionally brings that product into the Oklahoma marketplace. Native Wholesale Supply is not a passive bystander in this process. It reaps a hefty financial reward for delivering its products into the stream of commerce that brings it into Oklahoma. To claim, as Native Wholesale Supply does, that it does not know, expect, or intend

that the cigarettes it sells to Muscogee Creek Nation Wholesale are intended for distribution and resale in Oklahoma is simply disingenuous.

In short, Native Wholesale Supply does not "merely set its products adrift on a stormy sea of commerce which randomly [sweeps] the products into" Oklahoma. They arrive here by the purposeful collective acts of the Company and the tribal wholesalers with whom it does business. We hence hold that the minimum contacts segment of due process analysis is satisfied.

*Id.* at ¶¶ 23–25, 237 P.3d at 208–209 (footnote omitted).

¶ 14 In resolving the subject matter jurisdiction issue, *Native Wholesale Supply I* reviewed tribal immunity and Indian Commerce Clause jurisprudence and examined the pertinent facts accordingly. In deciding Oklahoma courts have subject matter jurisdiction in this case, *Native Wholesale Supply I* observed and concluded that:

The transactions at issue in this case are between a Sac and Fox chartered corporation operating on the tribal land of another tribe with a third tribe, the Muscogee Creek Nation. Such transactions are not beyond the reach of state authority.

In reality, Native Wholesale Supply's transactions with Muscogee Creek Nation Wholesale extend beyond the boundaries of any single "reservation." The cigarettes at issue are manufactured in Canada, shipped into the United States, and stored in a Free Trade Zone in Nevada. Muscogee Creek Nation Wholesale places orders for cigarettes from its "reservation" located within the territorial boundaries of this State to Native Wholesale Supply at the latter's principal place of business on another "reservation" in another State. Delivery of the cigarettes to Muscogee Creek Nation Wholesale requires shipment of the cigarettes from Nevada to the pur-

chaser's tribal land in Oklahoma. The entire process comprising these sales thus takes place in multiple locations both on and off different tribal lands. This is not on-reservation conduct for purposes of Indian Commerce Clause jurisprudence, but rather off-reservation conduct by members of different tribes....

*Id.* at ¶¶ 44–45, 237 P.3d at 216 (footnote omitted).

¶ 15 The above conclusions based upon the undisputed materials in the record on appeal were necessary to the resolution of the jurisdictional issues presented in *Native Wholesale Supply I.* In its motion for summary judgment post-remand, the AG took the position that the factual conclusions in *Native Wholesale Supply I* were the settled law of the case and binding on the district court. NWS responded that jurisdictional facts are not conclusive of factual issues on the merits which require a higher standard of proof, that it did not waive its right to a jury trial, and that it was entitled to summary judgment.

¶ 16 On summary judgment, NWS did not assert error in the factual conclusions in *Native Wholesale Supply I* nor did it present any additional probative evidence to dispute any material fact. In its appeal brief, NWS contends that the factual conclusions in *Native Wholesale Supply I* are *obiter dicta*[5] and not binding on the district court because all that is required to establish jurisdictional facts is a *prima facie* showing of defendant's connection with the forum states.

¶ 17 NWS' argument for the procedural protection of a standard of proof higher than a *prima facie* showing is unavailing here. The evidence in the appellate record analyzed in *Native Wholesale Supply I* supported more than an inference or a rebuttable presumption.[6] The undisputed probative evidence in *Native Wholesale Supply I* clearly showed the Seneca cigarette brand was not listed on the AG's directory after August

---

**5.** The conclusions in *Native Wholesale Supply I* were necessary to decide the jurisdictional issues presented and were not *obiter dicta.* *Burch v. Allstate Ins. Co.,* 1998 OK 129, ¶ 12, 977 P.2d 1057, 1062–1063; *Huston v. Scott,* 1908 OK 10, 94 P. 512, *Syllabus by the Court.*

**6.** A *prima facie* showing is evidence that establishes a given fact necessary to a judgment, but which may be refuted by other evidence. *Sides v. John Cordes, Inc.,* 1999 OK 36, ¶ 14, 981 P.2d 301, 306.

of 2006 (Thus, Seneca cigarettes were contraband in Oklahoma by operation of law.); Seneca cigarettes were brought into Oklahoma by the purposeful collective acts of NWS and the wholesalers with whom it did business (based upon the NWS' president's undisputed affidavit detailing the distribution process); the undisputed distribution process that brought Seneca cigarettes to the general public in Oklahoma was not on-reservation conduct beyond the reach of this State's authority, even though it involved members of several Native American tribes located on tribal land; and NWS intentionally distributed Seneca cigarettes to be sold in the Oklahoma cigarette market (based upon the sheer volume of Seneca cigarettes sold by NWS to wholesalers in this State).

¶ 18 The settled-law-of-the-case doctrine [7] "operates to bar relitigation of (a) issues in a case which are finally settled by an appellate opinion or of (b) those the aggrieved party failed to raise on appeal." *Smedsrud v. Powell*, 2002 OK 87, ¶ 13, 61 P.3d 891, 896. Upon remand, the parties in this case were free to repress and rehash their claims and defenses except for the settled law of the case. "In postremand summary process the settled law of the case operates upon all the facts revealed by the probative materials before the court at the time the law's settling took place." *Id.* The factual conclusions in *Native Wholesale Supply I* are settled between the parties in this case and were binding on the district court on summary judgment.

¶ 19 There is but one exception to the settled-law-of-the-case doctrine—the doctrine does not apply where the prior decision was palpably erroneous and will result in gross injustice.[8] On appeal, NWS argues that it was denied a jury trial on an undecided question of fact when the district court gave preclusive effect to this Court's statements in the prior appeal. Although NWS does not specify the undecided question of fact, apparently it was whether NWS knew it violated the Complementary Act which we address in part V of this opinion. NWS argues that the prior opinion works a manifest injustice but does not support this argument with fact or law. This shallow argument does not bring NWS within the palpably-erroneous-and-gross-injustice exception to the settled-law-of-the-case doctrine.

## V. NWS was not entitled to have a jury decide whether it knew the sale of Seneca cigarettes violated the Complementary Act.

¶ 20 On appeal, NWS contends that *Native Wholesale Supply I* concluded it had knowledge that the cigarettes would be sold in Oklahoma, but **did not conclude** that it had knowledge that the sales would be in violation of the Complementary Act. NWS also contends that it did not know the sales violated the Complementary Act [9] and argues that the AG did not offer any evidence showing that the cigarette sales violated the Complementary Act.

¶ 21 In response, the AG asserts that the manufacturer of Seneca cigarettes, Grand

---

7. The settled-law-of-the-case doctrine is firmly established. *Wellsville Oil Co. v. Miller*, 1915 OK 483, 150 P. 186, 48 Okla. 386 (*Syllabus* No. 3, "[N]o question open to dispute, either expressly or by implication, decided on appeal, will be open for review upon a second appeal between the same parties in regard to the same subject-matter."); *Handy v. City of Lawton*, 1992 OK 111, ¶ 13, 835 P.2d 870, 873 ("When Handy I was brought, all of the facts about both the scope of the officer's employment and the requirements for carrying out his duties were known or could have been developed. The sufficiency of those same facts were determined by the Court of Appeals in Handy I and may not be questioned on subsequent appeal."); *Miller Dollarhide, P.C. v. Tal*, 2006 OK 27, ¶ 8, n. 11, 174 P.3d 559, 563 (citing *In re Estate of Severns*, 1982 OK 64, ¶ 5, 650 P.2d 854, 856, reaffirmed that issues settled,

or that could have been settled, on appeal will not be subject to further litigation between the parties in that case.)

8. The palpably-erroneous exception to the settled-law-of-the-case doctrine is limited to extreme circumstances of manifest injustice. *Bierman v. Aramark Refreshment Services, Inc.*, 2008 OK 29, ¶ 13, 198 P.3d 877, 881–882; *Acott v. Newton & O'Connor*, 2011 OK 56, ¶ 11, 260 P.3d 1271, 1274.

9. If, by this contention, NWS is urging ignorance of the law, we reject it. "It is axiomatic, that in most instances, ignorance of the law is no excuse, and every person is presumed to know the law." *Estes v. ConocoPhillips Co.*, 2008 OK 21, ¶ 22, 184 P.3d 518, 526–527 (footnote omitted).

River Enterprises Six Nations, Ltd., had an escrow deficiency of more than Five Million Dollars for 2005 and 2006, and because of its escrow deficiency, Grand River Enterprises and Seneca brand cigarettes were removed from the AG's directory on August 1, 2006. For these facts, the AG cites to *State ex rel. Edmondson v. Grand River Enterprises Six Nations, Ltd.*, 2013 OK CIV APP 58, 308 P.3d 1057 (cert. denied by Oklahoma Supreme Court on May 28, 2013, and cert. denied by the United States Supreme Court on December 2, 2013, *Grand River Enterprises Six Nations, Ltd. v. Oklahoma ex rel. E. Scott Pruitt, Attorney General,* — U.S. ——, 134 S.Ct. 683, 187 L.Ed.2d 549). The AG also asserts that the appellate record shows the AG's office contemporaneously advised NWS that Grand River Enterprises and Seneca brand cigarettes would be removed from the AG's directory on August 1, 2006, and that Seneca cigarettes would be contraband in Oklahoma; that from August 1, 2006 to August 16, 2010, NWS shipped or sold more than 600 million illegal contraband Seneca cigarettes into Oklahoma; and that the settled law of the case is that NWS distributed contraband cigarettes to wholesalers in Oklahoma with the knowledge, expectation, and intention that the cigarettes would be sold in the Oklahoma cigarette market.

¶ 22 The AG's response is supported by the appellate record. The AG submitted an affidavit swearing that prior to removing Seneca cigarettes from the AG's directory, the AG's office advised NWS' attorney that Seneca cigarettes would be removed and would be contraband in Oklahoma. NWS did not contradict the AG's evidence that NWS knew Seneca cigarettes would be removed from the AG's directory and would be contraband in Oklahoma.

¶ 23 NWS argues that each and every pack of the Seneca cigarettes it caused to be imported and distributed into Oklahoma was stamped "for reservation sales only," proving that it intended the cigarettes were to be sold only on Native American reservations.

According to NWS, the stamp proves it did not have knowledge that the Seneca cigarettes would be sold in violation of the Complementary Act. NWS made this claim in the first appeal, and we rejected it as simply disingenuous. *Native Wholesale Supply I,* 2010 OK 58, ¶¶ 22, 24, 237 P.3d at 208. With this argument, NWS acquiesces in the fact that it intentionally imported and distributed Seneca cigarettes for sale in Oklahoma. The point is settled as a matter of law in this case: NWS intentionally and purposefully brought contraband Seneca cigarettes into the Oklahoma marketplace. *Id.* ¶ 24, 237 P.3d at 208.

¶ 24 Further, NWS was not entitled to a jury trial on the unsettled fact issues on remand. The Complementary Act does not provide for a jury trial, and there is no guaranteed constitutional right to a jury trial in this dispute. The United States Constitution [10] and the Oklahoma Constitution [11] preserve the common law right to trial by jury in civil cases:

> The right to trial by jury, declared inviolate by Article II, Section 19, of the Constitution of Oklahoma, except as modified by the Constitution itself, has reference to the right as it existed in the territories at the time of the adoption of the Constitution, and the right to a jury trial therein referred to was not predicated upon the statutes existing in the territories at that time, but the right as guaranteed under the United States Constitution and according to the course of the common law.

*A.E. v. State,* 1987 OK 76, ¶ 11, 743 P.2d 1041, 1044; *Maryland Nat. Ins. Co. v. District Court of Oklahoma County,* 1969 OK 73, ¶ 0, 455 P.2d 690, *Syllabus by the Court,* No. 1; *Keeter v. State ex rel. Saye,* 1921 OK 97, 82 Okla. 89, 198 P. 866, *Syllabus by the Court,* No. 1.

¶ 25 This is not a suit recognized at common law. This is a suit authorized by statute to disgorge the gross proceeds NWS gained from the flagrant violation of Oklahoma's Complementary Act.[12] This is not a civil ac-

---

10. Seventh Amendment, U.S. Const.

11. Art. 2, § 19, Okla. Const.

12. Throughout this litigation, the AG has sought to disgorge NWS' gross proceeds realized from the distribution of contraband Seneca cigarettes

tion with a guaranteed right to trial by jury. NWS was not entitled to have a jury decide whether it knew the distribution or sale of contraband Seneca cigarettes violated · the Complementary Act or to determine the amount of the gross proceeds it realized from the distribution of the contraband cigarettes in Oklahoma.

## VI. The AG was entitled to summary judgment and a $47,767,795.20 award, as a matter of law.

■■■ ¶ 26 In support of its motion for summary judgment, the AG submitted twenty evidentiary exhibits. NWS offered only one exhibit, the AG's motion to dismiss the first appeal, in support of its cross-motion for summary judgment.[13] NWS did not challenge or dispute any of the AG's summary judgment evidentiary material.[14]

¶·27 The AG requested the district court to enter summary judgment in its favor and to order NWS to disgorge the gross receipts received from the sale of Seneca cigarettes as evidenced by Exhibits 5 and 6. Exhibits 5 and 6 were sales and shipping records which NWS supplied to the AG in the bankruptcy court in New York. The district court inquired whether these two exhibits are "the gospel," and NWS' attorney replied in the affirmative. NWS made no effort in the district court to dispute the material facts that it imported and directed the distribution of Seneca cigarettes into Oklahoma as shown in the sales and shipping records included in Exhibits 5 and 6. These two exhibits, according to the AG, show NWS' gross receipts from its sales of Seneca cigarettes in violation of the Complementary Act totaled at least $47,767,795.20. The AG requested a $47,767,795.20 award against NWS to be paid into the Oklahoma Tobacco Settlement Endowment Fund.

¶ 28 The district court entered summary judgment in favor of the AG and ordered NWS be disgorged of $47,767,795.20 of its gross receipts. On appeal, NWS contends that disgorgement of gross receipts from all sales of cigarettes brought into Oklahoma is erroneous and that it should have had an opportunity to present evidence showing the significant portion of its gross receipts that were attributable to federal excise taxes and the costs of the cigarettes. On summary

in Oklahoma pursuant to 68 O.S.Supp.2004, § 360.8(F) and (G). On remand after the first appeal, the basic dispute concerned the amount of gross proceeds NWS gained from its flagrant violations of the Complementary Act, that is, the money which shall be disgorged and deposited into the Oklahoma Tobacco Settlement Endowment Fund for the support of the health and well-being of Oklahoma citizens in accordance with § 360.8(G).

**13.** In its cross-motion, NWS urged that it was entitled to summary judgment as a matter of law because Native American law issues are palpably complex and no one is clear on what the law is as evidenced in this case where the trial judge ruled that the case is barred by the Indian Commerce Clause and this Court reversed the trial court; that NWS and Muscogee Creek Nation met to discuss whether "Nation to Nation sales" are subject to state taxation and escrow requirements; and that the Tenth Circuit has noted that it is not clear that the state has authority to enforce the Complementary Act, citing *Muscogee (Creek) Nation v. Pruitt*, 669 F.3d 1159 (10th Cir.2012). NWS offered the AG's motion to dismiss the first appeal to support the fact that it met with Muscogee Creek Nation to discuss "Nation to Nation sales."

We recognize the complexity of Native American law, but that is simply not a valid defense to a suit in state court against a Native American. As to "Nation to Nation sales," *Native Wholesale Supply I* held that NWS "was not clothed with tribal immunity from suit" as it "operates solely as a private business for the personal profit of its owner who happens to be a Native American belonging to the Seneca Nation." *Native Wholesale Supply I*, 2010 OK 58 at ¶ 33, 237 P.3d at 210–211. As to federal preemption, *Native Wholesale Supply I* observed, "[t]here is no federal jurisprudence pronouncing Indian sovereignty in the area of cigarette distribution and sales, nor have we been directed to any congressional enactments reflecting and encouraging tribal self-sufficiency and economic development through the distribution and sale of cigarettes." *Id.* at ¶ 47, 237 P.3d at 216. Finally, *Muscogee (Creek) Nation v. Pruitt* is not on point here. The district court correctly denied NWS' cross-motion for summary judgment.

**14.** NWS' failure to present any evidence would not necessarily prevent it from showing an actual controversy as to a material fact issue. *Hadnot v. Shaw*, 1992 OK 21, ¶ 18, 826 P.2d 978, 984. NWS could show the existence of a substantial dispute of a material fact through the AG's evidentiary materials. *Id.* But here, NWS did not challenge the AG's evidentiary material or offer any evidence to rebut the AG's evidence.

judgment, NWS did have an opportunity to present evidence to the district court. However, in responding to the AG's motion for summary judgment, NWS did not offer any evidentiary material showing the amount it paid, if any, for federal taxes on the cigarettes it imported from Canada; the amount it paid, if any, to the cigarette manufacturer; or the amount it paid, if any, for transportation and storage of the cigarettes it caused to be imported and shipped into Oklahoma during the period from August of 2006 to August of 2010.

¶ 29 On summary judgment, NWS had a duty to come forward with acceptable evidence to controvert the AG's material facts, to raise a substantial controversy as to the appropriate monetary award to be imposed, or to otherwise oppose the AG's request for disgorgement of gross receipts for violation of the Complementary Act.[15] Rule 13, Rules for District Courts, 12 O.S.2011, ch. 2, app. It did not do so, and we will not resurrect procedural rights that NWS did nothing to preserve on summary judgment in the district court.

¶ 30 The certification provisions in the Complementary Act expressly require an importer of cigarettes manufactured outside the United States to accept joint and several liability with the nonparticipating manufacturer for all escrow deposits, penalties, costs, and attorney fees assessed or imposed under the Escrow Statute.[16] The parties do not question that the Canadian manufacturer of Seneca cigarettes failed to comply with the Escrow Statute and the Complementary Act and that, under the Complementary Act, Seneca cigarettes were contraband in Oklahoma after August 1, 2006.[17] NWS knew it was importing and distributing cigarettes from a manufacturer that did not comply with the Escrow Statute and the Complementary Act. NWS did nothing to meet the escrow requirements of its foreign cigarette manufacturer. Rather, NWS intentionally distributed the contraband Seneca cigarettes into Oklahoma knowing the State was not financially protected, as directed in the Complementary Act, from shouldering the costs of medical conditions caused by the cigarettes. NWS' conduct was unlawful under the Complementary Act:

E. 1. It shall be unlawful for a person to:

a. sell or distribute cigarettes, or

b. acquire, hold, own, possess, transport, import, or cause to be imported cigarettes that the person knows or should know are intended for distribution or sale in the state in violation of the Master Settlement Agreement Complementary Act. A violation of the act shall be a misdemeanor.

68 O.S.Supp.2004, § 360.7(E)(1).

¶ 31 An order disgorging gross receipts is an authorized remedy for violation of the Complementary Act:

G. If a court determines that a person has violated the Master Settlement Agree-

---

15. A party responding to summary judgment has an obligation to present some material that shows a trial is necessary. *Davis v. Leitner*, 1989 OK 146, ¶ 12, 782 P.2d 924, 926.

16. 68 O.S.Supp.2004, § 360.4(A)(6) provides:

In the case of a nonparticipating manufacturer located outside of the United States, the certification shall further certify that the nonparticipating manufacturer has provided a declaration from each of its importers into the United States of any of its brand families to be sold in Oklahoma. The declaration shall be on a form prescribed by the Attorney General and shall state that such importer accepts joint and several liability with the nonparticipating manufacturer for all escrow deposits due, for all penalties assessed and for payment of all costs and attorney fees imposed in accordance with Sections 600.21 through 600.23 of Title 37 of the Oklahoma Statutes. Such declaration shall appoint for the declaration a resi-

dent agent for service of process in Oklahoma in accordance with Section 360.5 of this title.
Enacted after the time period involved in this case, 68 O.S.Supp.2009, § 360.5–1 imposes joint and several liability upon the importer for "deposit of all escrow due, payment of all penalties imposed and payment of all costs and attorney fees."

17. 68 O.S.Supp.2004, § 360.7(B) provides

B. Any cigarettes that have been sold, offered for sale, or possessed for sale in this state or imported for personal consumption in this state, in violation of the Master Settlement Agreement Complementary Act, shall be deemed contraband pursuant to the Master Settlement Agreement Complementary Act. Those cigarettes shall be subject to seizure and forfeiture as provided by this section and all cigarettes so seized and forfeited shall be destroyed as provided by this section and not resold.

ment Complementary Act, **the court shall order any profits, gain, gross receipts, or other benefit from the violation to be disgorged** and paid to the State Treasurer for deposit in the Tobacco Settlement Endowment Trust Fund. Unless otherwise expressly provided, the remedies or penalties provided by the Master Settlement Agreement Complementary Act are cumulative to each other and to the remedies or penalties available under all other laws of this state.

*Id.* § 360.8(G) (emphasis added). In reviewing § 360.8(G), we begin with the language, and if it is unambiguous, we assign the plain meaning to the words.[18] The above highlighted statutory language is not susceptible to more than one interpretation.[19] On its face, the plain meaning of the highlighted language is clear. Section 360.8(G) is a legislative mandate to the courts to order disgorgement of 1) profits, 2) gain, 3) gross receipts, OR 4) other benefit from the violation of the Complementary Act. The use of the disjunctive "or" indicates the choices are alternatives,[20] and the court has discretion as to the amount it will order to be disgorged.

¶ 32 Section 360.8(G) further provides that the remedies and penalties in the Complementary Act are cumulative to each other and to remedies and penalties in other laws. A cumulative remedy is one created by statute in addition to another remedy that remains in force.[21] A reading of the entire subsection indicates legislative intent to provide alternative and concurrent remedies and penalties that will secure enforcement of the Complementary Act and deter violations such as NWS' conduct. Here, the AG, in his discretion, sought and the district court, in its discretion, ordered that NWS disgorge its gross receipts from its four years of continuous violation of the Complementary Act.

¶ 33 We must now determine whether the appellate record establishes each and every material fact necessary to support the summary judgment order disgorging NWS' gross receipts from the distribution of contraband Seneca cigarettes in Oklahoma in the amount of $47,767,795.20, as a matter of law. We have carefully examined the appellate record for evidence supporting the $47,767,795.20 summary judgment award to the AG, in particular, the sales and shipping records with Bowen Wholesale (Exhibit 5) and the sales and shipping records with Muscogee Creek Nation Tobacco Wholesale (Exhibit 6). We also examined NWS' invoices to Muscogee Creek Nation Tobacco Wholesale (Exhibits 7 and 17).

¶ 34 Exhibit 5 is a spreadsheet documenting NWS' sales to Bowen Wholesale from February 6, 2006 through August 16, 2010, which totaled $8,721,193.80. Exhibit 6 is a spreadsheet documenting NWS' sales to Muscogee Creek Nation Wholesale from February 13, 2007 through August 16, 2010, which totaled $39,726,693.70. Exhibits 7 and 17 are the invoices for the transactions between NWS and Muscogee Creek Nation Wholesale contained in Exhibit 6. Exhibits 5 and 6 show total gross proceeds realized by NWS to be $48,447,887.00. However, excluding from Exhibit 6 the transactions that occurred prior to August 1, 2006, Exhibits 5 and 6 support the AG's claim that NWS had gross receipts which totaled at least $47,767,795.20 from the sale of contraband Seneca cigarettes for resale in Oklahoma from August of 2006 to August of 2010. The evidence is more than sufficient to support the judgment of $47,767,795.20. Under the Complementary Act, the settled law of the case, and the undisputed material facts on summary judgment, we determine and hold that, as a matter of law, the AG is entitled to summary judgment in the amount of $47,767,795.20 for deposit in the Tobacco Settlement Endowment Trust Fund.

**18.** *W.R. Allison Enterprises, Inc. v. CompSource Okla.,* 2013 OK 24, ¶ 14, 301 P.3d 407; *Yocum v. Greenbriar Nursing Home,* 2005 OK 27, ¶ 9, 130 P.3d 213.

**19.** "The test for ambiguity in a statute is whether the statutory language is susceptible to more than one reasonable interpretation." *In the Matter of J.L.M.,* 2005 OK 15, ¶ 5, 109 P.3d 336, 338.

**20.** *Id.* 2005 OK 15 at ¶ 7, 109 P.3d at 338–339.

**21.** *Goss v. Trinity Sav. & Loan Ass'n,* 1991 OK 19, ¶ 14, 813 P.2d 492, 495.

## VII.  Conclusion

¶ 35 The Escrow Statute and the Complementary Act express Oklahoma's public policy concerning the harm caused by cigarette smoking and tobacco-related illness.  Cigarette smoking is a danger not only to our public health, but also to the fiscal soundness of this state.  37 O.S.Supp.1999, § 600.23(B). Importing and distributing Six Hundred Million contraband Seneca cigarettes into Oklahoma contrary to Oklahoma's public policy, NWS has derived a large cost advantage and an enormous short-term profit before liability may arise from the use of the contraband cigarettes without ensuring that Oklahoma will have a source of recovery from NWS or before NWS becomes judgment-proof.  *Id.*

¶ 36 In deciding that personal jurisdiction over NWS comported with fair play and substantial justice, *Native Wholesale Supply I* evaluated the burden on NWS to defend in the forum State, the interests of the forum State in obtaining relief, the most efficient resolution of controversies, and the shared interest of the several States in furthering fundamental substantive social policies.  *Native Wholesale Supply I*, 2010 OK 58 at ¶ 26, 237 P.3d at 208.  *Native Wholesale Supply I* observed:

> First, the interest of the State in adjudicating this matter in Oklahoma is obviously very strong.  The integrity of the Master Settlement Agreement depends on the ability of the State to enforce its terms.  A decision adverse to the state on this issue would permit cigarette manufacturers and wholesalers to evade the MSA by setting up distribution networks whose participants pose as fully independent entities engaging in carefully structured transactions that ostensibly take place outside of the State.  In this way, tobacco manufacturers and merchants could purposefully, albeit indirectly, target cigarettes at Oklahoma, reaping the economic benefit of engaging in the tobacco industry while evading the public policy embodied in the MSA

and the Complementary Act of shifting the burden of tobacco-related health care costs from the State to the entities who profit from the smoking enterprise.

> Second, defending this suit in Oklahoma does not present an undue burden on Native Wholesale Supply.  Any burden upon Native Wholesale Supply from mounting a defense in Oklahoma is clearly minimal in light of the State's uncontroverted allegation that the Company reaps millions of dollars from the sale of Seneca cigarettes to Oklahoma consumers.

> Finally, the states have a collective interest in the efficient resolution of controversies and in furthering fundamental substantive social policies.  The courts of this State and only the courts of this State offer the most efficient and rational forum for the resolution of a controversy over the meaning and effect of State statutes governing the allocation of the financial and health-care costs associated with smoking between the public and private sectors.

*Id.* ¶¶ 26–29, 237 P.3d at 208.

¶ 37 Here, NWS purposefully targeted the Oklahoma cigarette market and reaped the economic benefit of selling cigarettes in Oklahoma.  Defiantly, NWS continued to import and distribute contraband Seneca cigarettes into Oklahoma and reap millions of dollars from the sale of the contraband cigarettes to Oklahoma consumers for more than two years after Oklahoma's chief law enforcer filed this suit.  NWS may not evade the public policy embodied in the MSA, the Escrow Statute, and the Complementary Act and thereby shift the burden of tobacco-related health care costs to the State.  Disgorging gross receipts that NWS, a cigarette importer and distributor, received when it intentionally distributed contraband cigarettes into the Oklahoma market in violation of the Complementary Act is no more excessive than seizing and forfeiting contraband cigarettes from a cigarette distributer or wholesaler.[22]  NWS' claim to Eighth Amend-

22. *Washington v. Confederated Tribes of Colville Indian Reservation*, 447 U.S. 134, 161–162, 100 S.Ct. 2069, 2085, 65 L.Ed.2d 10 (1980), found that Washington's interest in enforcing its taxes on cigarettes justified seizure of the cigarettes in transit when the Tribes refused to fulfill collection and remittance obligations under state law; and that the off-reservation, en route seizures allow the State to police against wholesale evasion of its taxes.  *Oklahoma Tax Com'n v. Citizen*

ment protection minimizes the egregiousness of its flagrant disrespect for Oklahoma, our laws, and our citizens.

¶ 38 NWS had gross receipts that totaled at least $47,767,795.20 from the sale of contraband Seneca cigarettes for resale in Oklahoma from August of 2006 to August of 2010. Based upon the Complementary Act, the settled law of the case, and the undisputed material facts on summary judgment, the summary judgment was proper, and the district court did not abuse its discretion in denying NWS a new trial.

### DISTRICT COURT'S SUMMARY JUDGMENT AFFIRMED.

COLBERT, C.J.; REIF, V.C.J.; and WATT, WINCHESTER, and TAYLOR, JJ., concur.

KAUGER, J., concurs in result.

GURICH, J. (by separate writing) dissents.

EDMONDSON and COMBS, JJ., disqualified.

GURICH, J., dissenting.

¶ 1 In the first appeal in this case, *State ex rel. Edmondson v. Native Wholesale Supply,* 2010 OK 58, 237 P.3d 199 (*Native Wholesale Supply I* ), this Court decided two issues: 1) "Is an Oklahoma court a constitutionally sanctioned forum for the exercise of personal jurisdiction to adjudicate an alleged violation of a state statute by Native Wholesale Supply, a nonresident corporation that claims to have no minimum contacts with Oklahoma?" and 2) "Does federal law bar Oklahoma from enforcing the Complementary Act against Native Wholesale Supply, a tribally-chartered corporation wholly owned by an individual of Native–American ancestry?" *Native Wholesale Supply I,* 2010 OK 58, ¶ 1, 237 P.3d at 203.

¶ 2 As to the first question, this Court relied on the stream-of-commerce theory of personal jurisdiction and found that "Native Wholesale Supply does not 'merely set its products adrift on a stormy sea of commerce which randomly [sweeps] the products into' Oklahoma. They arrive here by the purposeful collective acts of the Company and the tribal wholesalers with whom it does business. We hence hold that the minimum contacts segment of due process analysis is satisfied." *Id.* ¶ 25, 237 P.3d at 209. As to the second question, this Court held the Master Settlement Agreement Complementary Act (MSACA) applied to Native Wholesale Supply and that the Indian Commerce Clause did not bar enforcement of the Act against Native Wholesale Supply. *Id.* ¶¶ 43–45, 237 P.3d at 215–16. **This Court did not address the merits of the case, i.e., whether Native Wholesale Supply actually violated the MSACA.**

¶ 3 On remand, however, the Attorney General relied on the settled-law-of-the-case doctrine and on several statements from this Court in *Native Wholesale Supply I* to convince the trial court that no questions of fact were in dispute as to whether Native Wholesale Supply violated the MSACA. At issue now in this second appeal is whether the facts relied on by this Court in *Native Wholesale Supply I* in deciding the jurisdictional issues were binding on the trial court on remand in determining the merits of the case.

### *The Trial Court Was Not Constrained Under the Settled–Law–of–the–Case Doctrine by Any Factual Findings Made by This Court in Native Wholesale Supply I*

¶ 4 The settled-law-of-the-case doctrine bars relitigation of only those issues that have been settled by an appellate opinion. *Robert L. Wheeler, Inc. v. Scott,* 1991 OK 95, ¶ 10, 818 P.2d 475, 479.[1] *Native Wholesale*

Band Potawatomi Indian Tribe of Oklahoma, 498 U.S. 505, 514, 111 S.Ct. 905, 912, 112 L.Ed.2d 1112 (1991)(States may enforce taxes on cigarettes from wholesalers by seizing unstamped cigarettes off the reservation.).

1. "Where, on the judgment's reversal, a cause is remanded, it returns to the trial court as if it had

never been decided, save only for the 'settled law' of the case." *Smedsrud v. Powell,* 2002 OK 87, ¶ 13, 61 P.3d 891, 896. "The parties are relegated to their prejudgment status and are free to *re*-plead or *re*-press their claims as well as defenses." *Id.* "The doctrine embodies a call for judicial economy designed to prevent 'rehashing'

*Supply I* only settled that the courts of this state may exercise jurisdiction over the non-resident defendant Native Wholesale Supply; Native Wholesale Supply is not immune from suit in state court based on tribal immunity; and the Indian Commerce Clause does not bar enforcement of the MSACA against Native Wholesale Supply. The trial court might have been bound by the factual findings made by this Court in *Native Wholesale Supply I* had the jurisdictional issues been intertwined with the merits of the case.[2] **However, neither party argued in *Native Wholesale Supply I* that the jurisdictional issues were intertwined with the merits of the MSACA claim, and this Court made no such finding.** "[A] claim based upon a lack of jurisdiction is usually considered to be a claim *not* affecting the merits of the controversy."[3]

¶ 5 Even so, a jurisdictional issue is only intertwined with the merits when jurisdiction is "dependent upon an issue that is also an element to the merits of the cause of action, and the adjudication of the jurisdictional issue necessarily adjudicates a cause of action or defense thereto." *Lucas*, 2013 OK 14, ¶ 8, 297 P.3d at 383. In this case, the adjudication of the jurisdictional issues in *Native Wholesale Supply I* did not adjudicate any

elements of the MSACA claim, contrary to the Attorney General's assertion.[4] The MSACA provides:

It shall be unlawful for a person to:

a. sell or distribute cigarettes, or

b. acquire, hold, own, possess, transport, import, or cause to be imported cigarettes that the person knows or should know are intended for distribution or sale in the state in violation of the Master Settlement Agreement Complementary Act....

68 O.S. Supp. § 2004 360.7(E).

In other words, the State must prove in this case that Native Wholesale Supply, *at the time it sold the cigarettes to the respective wholesalers, knew or should have known that the wholesalers intended for the cigarettes to be distributed or sold in violation of the MSACA.* While some of the facts discussed in *Native Wholesale Supply I* might be relevant in proving Native Wholesale Supply's knowledge at the time it sold the cigarettes to the wholesalers, **intentionally bringing cigarettes into the Oklahoma marketplace for purposes of stream-of-commerce theory of personal jurisdiction *does not* equate to knowledge of the wholesalers' intent to sell or distribute the cigarettes in violation of the MSACA.[5]**

of issues in successive appeals." *Id.* "In postremand summary process the settled-law-of-the-case doctrine operates upon all the facts revealed by the probative materials before the court at the time the law's settling took place." *Id.*

2. *State ex rel. Bd. of Univ. of Okla. v. Lucas*, 2013 OK 14, ¶ 8, 297 P.3d 378, 383.

3. *Lucas*, 2013 OK 14, ¶ 7 & n. 5, 297 P.3d at 383 & n. 5 (citing *Ricks Exploration Co. v. Oklahoma Water Res. Bd.*, 1984 OK 73, 695 P.2d 498; *Swan v. Sargent Indus.*, 1980 OK CIV APP 49, 620 P.2d 473 (approved for publication by Supreme Court); *Samson Res. Co. v. Newfield Exploration Mid–Continent, Inc.*, 2012 OK 68, 281 P.3d 1278) (emphasis added).

4. In *Native Wholesale Supply I* this Court held that personal jurisdiction over Native Wholesale Supply was proper under the stream-of-commerce theory of personal jurisdiction. The Court found:

This is not a case where the defendant is merely aware that its product might be swept into this State and sold to Oklahoma consumers. The sheer volume of cigarettes sold by Native Wholesale Supply to wholesalers in this State

shows the Company to be part of a distribution channel for Seneca cigarettes that intentionally brings that product into the Oklahoma marketplace. Native Wholesale Supply is not a passive bystander in this process.

*Native Wholesale Supply I*, 2010 OK 58, ¶ 24, 237 P.3d at 208.

5. At the hearing on the motion for summary judgment, the trial court had doubts about the Attorney General's settled-law-of-the-case argument but nevertheless granted summary judgment to the State:

The Court: What I'm trying to understand is I understand the Supreme Court was deciding two issues: One was the personal jurisdiction issue and the other was the Indian Commerce Clause.
Mr. Chaffin: Which apply—
The Court: Forget the Indian Commerce Clause. Personal jurisdiction, they have made a lot of findings in here, a lot conclusions written by Justice Opala—
Mr. Chaffin: Yes.
The Court:—that supports personal jurisdiction, I understand that—
Mr. Chaffin: Yes, sir.

*Even If the Trial Court Was Bound by Factual Findings in Native Wholesale Supply I, Disputed Questions of Fact Remain as to Whether Native Wholesale Supply Violated the MSACA, Making Summary Judgment Improper*

¶ 6 The Attorney General's argument on remand that this Court "affirmatively settled that NWS intentionally sold, shipped, and/or caused Seneca cigarettes to be shipped into and within Oklahoma" in violation of the MSACA disregards a critical element of the MSACA claim.[6] Although Native Wholesale Supply does not dispute that cigarette sales took place,[7] **the fact that cigarette sales were made does not prove Native Wholesale Supply knew or should have known at the time it sold the cigarettes to the wholesalers that the wholesalers intended for the cigarettes to be distributed or sold in violation of the MSACA.**[8] The statute requires proof of such knowledge on the part of Native Wholesale Supply, and disputed questions of fact remain with regard to this issue.

¶ 7 The Attorney General argues it is affirmatively settled that the transactions between Native Wholesale Supply and Muscogee Creek Nation Wholesale are subject to the MSACA. But as Native Wholesale Supply points out, *at the time of the transactions between 2006 and 2010*, it was not settled that the transactions were subject to the MSACA. Native Wholesale Supply argued in *Native Wholesale Supply I* that tribal to tribal transactions were beyond the reach of state regulatory power, and as such, the transactions with Muscogee Creek Nation Wholesale were not subject to the MSACA. *Native Wholesale Supply I*, 2010 OK 58, ¶ 43, 237 P.3d at 215. The trial court in *Native Wholesale Supply I* agreed with this interpretation of the law and initially dismissed the suit finding it was barred by the Indian Commerce Clause. Not until the appeal in *Native Wholesale Supply I* in 2010[9] did this Court conclusively decide that the MSACA applied to Native Wholesale Supply and that neither tribal immunity nor the Indian Commerce Clause barred enforcement of the MSACA against Native Wholesale Supply. So then, how could Native Wholesale Supply have known at the time of the transactions that Muscogee Creek Nation Wholesale intended for the cigarettes to be distributed or sold in violation of the MSACA when it was not clear whether the MSACA even applied to the transactions?

¶ 8 The Attorney General argues Native Wholesale Supply had knowledge as early as 2003 that the transactions with Muscogee Creek Nation Wholesale were problematic

> The Court:—does that prove your case?
> Mr. Chaffin: The—many of those opinions prove that they had knowledge, that it was disingenuous to argue that, that they know—that they have to know it's being sold to the general public. There's no other reasonable conclusion.
> . . . .
> The Court: [I]'d like to make the distinction that they're just doing personal jurisdiction, but [the Court] was ... very broad in what [it] said here. I'm bound by that.
> *Record on Accelerated Appeal*, Ex. 8 at 25–26.

6. *Record on Accelerated Appeal*, Ex. 4 at 14.

7. Counsel for Native Wholesale Supply stated at the hearing on the motion for summary judgment:

> The issue of whether the MSACA applies to my client has been decided. The issue of whether my client has violated the MSACA has not been decided.... The only way to hook us into the liability here is by this one statute, which the cite is *68 O.S. 360.7(E)*, which specifically says,

> you know, it's unlawful to sell cigarettes that the person knows or should know are intended for sale in violation of the Act. That's the fact question before you today. Did we sell with knowledge that these cigarettes are intended for sale in violation of the Act[?] ... The fact that we made sales is not evidence of our knowledge of the intent of the people we sold to, to then violate the Act. And there's no evidence that they have presented that demonstrates that particular fact.
> *Record on Accelerated Appeal*, Ex. 8 at 12–13.

8. It is also undisputed that Seneca brand cigarettes have not been listed on the Oklahoma Attorney General's Directory since 2006 and have not been approved for sale within the state. *See* Record on Accelerated Appeal, Ex. 3 at 4; Record on Accelerated Appeal, Ex. 2 at 11.

9. The record indicates Native Wholesale Supply ceased selling to Muscogee Creek Nation Wholesale when this Court's opinion issued in July of 2010. *See Record on Accelerated Appeal*, Ex. 5 at n. 2.

under the MSACA.[10] But whether or not the State's evidentiary materials prove Native Wholesale Supply knew, or should have known, at the time it sold the cigarettes to the wholesalers that such entities intended for the cigarettes to be distributed or sold in violation of the MSACA is for the trier of fact to decide. Summary judgment is proper only when the pleadings, affidavits, depositions, admissions or other evidentiary material establish that there is no genuine issue as to any material fact. *Sullivan v. Buckhorn Ranch Partnership,* 2005 OK ¶41, 36, 119 P.3d 192, 203. I respectfully dissent.[11]

10. *See* Record on Accelerated Appeal, Ex. 6 (filed under seal pursuant to agreed protective order filed January 8, 2013).

11. Because summary judgment was improper, I would not address whether the trial court erred by awarding 100% of the gross receipts of Native Wholesale Supply to the State for Native Wholesale Supply's violation of the statute.